IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JEAN JOHNSON, | ) | |
| | ) | CASE NO. 1:13-CV-1390 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | **MEMORANDUM OPINION &** |
| | ) | **ORDER** |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. 15). The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Jean Johnson's ("Plaintiff" or "Johnson") application for a Period of Disability and Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, is supported by substantial evidence and, therefore, conclusive.  For the reasons set forth below, the Court AFFIRMS the Commissioner's decision.

## I.  PROCEDURAL HISTORY

Johnson filed an application for Disability Insurance benefits around January 19, 2010. (Tr. 687).  Plaintiff alleged she became disabled on December 1, 2009 due to suffering from depression, nerve damage in the throat, and chronic pain. (Tr. 728).  The Social Security Administration denied Plaintiff's application on initial review and upon reconsideration. (Tr. 631-38).

At Plaintiff's request, administrative law judge ("ALJ") James Dixon convened an administrative hearing on October 18, 2011 to evaluate her application. (Tr. 582-612, 615). Plaintiff, represented by counsel, appeared and testified before the ALJ. (*Id*).  A vocational expert ("VE"), Mark Anderson, also appeared and testified. (*Id.*).

On October 27, 2011, the ALJ issued an unfavorable decision, finding Johnson was not disabled. (Tr. 564-76).  After applying the five-step sequential analysis,[1] the ALJ determined Plaintiff retained the ability to perform work existing in significant numbers in the national economy. (*Id*.).  Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council. (Tr. 82).  The Appeals Council denied the request for review, making the ALJ's

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

    (1)    If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

    (2)    If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

    (3)    If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

    (4)    If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

    (5)    Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

2

October 27, 2011 determination the final decision of the Commissioner. (Tr. 1-4).  Plaintiff now

seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  EVIDENCE

### A.  Personal Background Information

Plaintiff was born on May 13, 1956, and was 56 years old on the date the ALJ rendered

his decision (Tr. 587), making her a "person of advanced age." 20 C.F.R. § 404.1563(e).  She

completed high school and has past relevant work as a medical secretary. (Tr. 587, 602-03).

### B.  Physical Impairments

During the relevant period, Johnson received virtually all treatment for her alleged

physical impairments from physicians at Metro Health Systems ("Metro Health").  Plaintiff

explained to her doctors that she began to suffer from jaw and related pain after dental

extractions around 2008. (Tr. 860, 860, 897, 910).

In the spring of 2009, Plaintiff underwent a series of tests due to complaints of sore throat

and nasal issues. (Tr. 952).  An April 2009 CT scan of Plaintiff's  paranasal sinuses showed mild

bilateral mastoiditis and localized mucosal thickening in the right anterior ethmoid air cells, but

was otherwise negative. (Tr. 868).

In June 2009, Plaintiff reported left throat pain and pressure in her ears to Dr. Tung

Trang. (Tr. 948, 952).  Dr. Trang performed a flexible fiberoptic scope. (Tr. 948).  All structures

were normal except for erythematous and edematous nasopharyngeal tissues, but these did not

have frank masses. (Tr. 948).  An MRI of Plaintiff's neck taken on June 29, 2009 revealed

nonspecific prominence of soft tissue in the nasopharynx, but no other abnormalities. (Tr. 864).

On July 14, 2009, Plaintiff reported throat and nose pain, pressure in her ears, and a sharp

pain on the right side of her head. (Tr. 945).  Plaintiff was referred for a hearing evaluation. (Tr.

3

942). Testing showed positive bilateral mild conductive hearing loss, fluid behind the right tympanic membrane, and Eustachian tube dysfunction on the left. (*Id.*).

During a visit to Metro Health on August 4, 2009, Plaintiff continued to complain of a chronic sore throat and ear pain. (Tr. 939). Dr. Freedom Johnson performed a nasopharyngolaryngoscopy that revealed (1) diffuse erythema with prominent symmetric adenoid bed, (2) diffuse hypopharyngeal edema, (3) appearance of 1 to 2 millimeter lesions throughout hypopharynx, (4) a discrete sessile papillomatous appearing lesion on the laryngeal surface of epiglottis, and (5) a similar lesion on the mid-left true vocal cord. (Tr. 940). Dr. Johnson recommended a biopsy of the lesions identified. (*Id.*).

Plaintiff underwent a biopsy of her tongue and uvula on August 10, 2009. (Tr. 882). The tongue biopsy showed squamous-lined mucosa with extensive submucosal lymphoid aggregates, which was consistent with lingual tonsillar tissues. The biopsy of the uvula revealed "squamous-lined mucosa with epithelial hyperplasia, acute and chronic inflammation, and dilated submucosal vasculature." (*Id.*). On August 29, 2009, Dr. Johnson observed that Plaintiff's lesions remained on the epiglottis, but were not clinically concerning for malignancy. (Tr. 937).

On September 23, 2009, Plaintiff followed up with Dr. Johnson for her oropharyngeal and left ear pain. (Tr. 933). She reported that the pain only responded to ibuprofen in the evenings. (*Id.*). After reviewing Plaintiff's test results, Dr. Johnson was unable to identify abnormalities to account for her symptoms. (Tr. 934). Dr. Johnson indicated that Plaintiff's symptoms were out of proportion to her examination. Applying aerosolized afrin and lidocaine gave Plaintiff "significant, although not complete, relief of her discomfort." The doctor prescribed Vicodin for severe nighttime pain. (*Id.*).

4

On November 9, 2009, Plaintiff reported to Dr. Karen Kea that she felt some relief with Advil, but had to take percocet when the pain was more severe. (Tr. 924).  On November 18, 2009, Plaintiff treated with Dr. Harvey Chim for her persistent left ear and mandibular pain. (Tr. 919).  Dr. Chim recounted that there had been multiple, extensive investigations with regard to Plaintiff's persistent left ear and mandibular pain, but they were "all normal." (*Id.*).  On December 23, 2009, Dr. Johnson opined that Plaintiff's symptoms might be attributed to glossopharyngeal neuralgia, and scheduled a glossopharyngeal nerve block. (Tr. 922).

On January 12, 2010, Johnson reported to Dr. Brendan Astley that her current medications did not alleviate her pain and she had trouble sleeping. (Tr. 910).  Dr. Astley noted that Plaintiff's duration for standing, sitting, and walking were unremarkable, despite Plaintiff's report that her current pain level was a "6" out of "10." (*Id.*).  The doctor diagnosed neuritis, and prescribed neurontin, percocet, methadone, nortriptyline, and ibuprofen. (Tr. 911-12).  Dr. Astley made note that neurotin caused sleepiness for Plaintiff in the past. (Tr. 911).

On February 16, 2010, Johnson expressed that her left jaw and neck pain was unchanged. (Tr. 906).  She described the pain as burning, continuous, and chronic, but could not identify what exacerbated it.  Dr. Ryan Gunselman observed that Plaintiff was alert and in no apparent distress.  He diagnosed otalgia, bilateral eustachian tube dysfunction, tympanosclerosis, and neuralgia of the inferior alveolar nerve. (*Id.*).  Agreeing with Dr. Gunselman, Dr. Astley slightly increased Plaintiff's medication and changed the timing of her usage. (Tr. 907).  He encouraged Plaintiff to use lidocaine because it decreased her pain from a "10" to a "3." (*Id.*).

On April 28, 2010, Plaintiff reported to Dr. Michael Yerukhim that her medications caused drowsiness, and she often had to choose between going to sleep or being in pain. (Tr. 1010).  Dr. Yerukhim noted that a lidocaine injection successfully, though temporarily, alleviated

5

pain.  During the examination, Johnson was alert and in no acute distress. (Tr. 1010-12).  A nerve block administered on May 11, 2010 provided complete pain relief. (1007-08).

State agency reviewing physician, Dr. Jerry McCloud, completed a physical residual functional capacity assessment on May 17, 2010. (Tr. 995).  Dr. McCloud noted that Johnson experienced chronic facial and throat pain since a 2008 tooth extraction, which caused nerve damage to the left side of her face. (Tr. 989).  He recommended that Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, and stand, walk, or sit for six hours in an eight hour workday.  (*Id.*).   Dr. McCloud found no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 990-92).

On May 19, 2010, Johnson reported to Dr. Karen Kea that the nerve injection made her pain tolerable. (1004).  But on June 14, 2010, Plaintiff reported that the injection only provided relief for 10 days. (Tr. 1002).  She presented to Dr. Kea due to sharp shooting pain in her head and low back pain. (*Id.*).  Nevertheless, Dr. Kea observed that Plaintiff was in no acute distress and alert. (*Id.*).  During a July 2010 appointment with Krista Mousted, CNP, Plaintiff reported that her pain was gradually worsening, and expressed interest in increasing her medication and undergoing another injection. (Tr. 997).

On September 1, 2010, Plaintiff presented to Dr. Donald Harvey complaining of muffled hearing and increased left ear pain.  (Tr. 1032).  She described her pain as sharp, knife-like, and of variable intensity.  Johnson reported that she had self-increased her dosage of methadone. (*Id.*).  Dr. Donald Harvey recommended an increased frequency of glossopharyngeal nerve blocks, an audiology examination, and an MRI of the neck. (Tr. 1035).

A September 2010 audiological evaluation revealed a "significant decrease in air conduction thresholds" and suggested Eustachian tube dysfunction. (Tr. 1031).  Johnson had

mild to moderate conductive hearing loss bilaterally. Audiologist Michael Starkey recommended Plaintiff as a possible candidate for amplification. (*Id.*).

Johnson's October 2010 MRI was unremarkable and did not explain her symptoms of glossopharyngeal neuralgia. (Tr. 1080).  On October 6, 2010, Plaintiff rated her pain at "5" out of "10," but she indicated that the pain was "tolerable" and the increase in methadone was helpful. (Tr. 1026).  She requested and received an increase in her neurontin prescription. (Tr. 1026-27).  Johnson was no longer interested in glossopharyngeal injections because they were too painful and provided relief for only a week. (Tr. 1026).  Ms. Mousted observed that Plaintiff was alert, in no distress, and cooperative. (*Id.*).

On October 12, 2010, state agency reviewing physician Dr. Gary Hinzman conducted an updated review of the record. (Tr. 1025).  Dr. Hinzman opined that the medical evidence did not reveal a significant change in Johnson's physical condition.   As such, he confirmed Dr. McCloud's RFC. (*Id.*).

On October 20, 2010, Plaintiff presented to Dr. Evan McBeath, and reported overmedicating at times with percocet and methadone in an attempt to ease pain.  (Tr. 1270).  Johnson rated her pain at "3" to "4" out of "10" at its best, but said that it increased to "10" at night.  She explained that the pain was stabbing and stemmed from the left side of her tongue, extending up to the left ear, and down to the left neck.

A physical examination with Dr. Johnson on October 23, 2010 was unremarkable. (Tr. 1273).  Dr. Johnson opined that Plaintiff suffered from left glossopharyngeal neuralgia of an unidentified etiology.  He explained that a more recent MRI showed no underlying lesion that could be the cause.  The doctor discussed the possibility of chemical or surgical neurolysis. (*Id.*).

In    December    2010,    Johnson    rated    her    pain    at "2" out of "10," but overall, she felt it was getting worse. (Tr. 1252).  She declined an injection. (Tr. 1253).  Physicians adjusted her medications and prescribed Xanax for anxiety. (*Id.*).  On January 27, 2011, Plaintiff refused an injection, because she thought it would provide little pain relief. (Tr. 1213).  Johnson reported that her pain was at "3" to "4" out of "10," and that Xanax helped her sleep through the night. (Tr. 1212-13).  Dr. Astley observed that Plaintiff's pain was "much better controlled with 3-4/10 from her previous 8-10/10 scores." (*Id.*).

Johnson had an acute episode of pain on February 16, 2011. (Tr. 1201).  She rated the pain at "10." (Tr. 1201).  After an injection of lidocaine, her pain decreased to a "2." Dr. Mark Weidenbecher opined that posttonsillectomy scarring could be the trigger for Plaintiff's pain. (*Id.*).  In April 2011, Plaintiff's medications were adjusted. (Tr. 1172).  Dr. Astley opined that Johnson was responding appropriately to opioid therapy.  He noted that healthcare providers were treating her symptoms, but the underlying pain issue may not improve. (*Id.*).

On August 26, 2011, Dr. Kea completed a medical source statement. (Tr. 1284).  The doctor opined that high doses of pain medicine caused drowsiness and would interfere with Plaintiff's ability to work. (Tr. 1284).  Dr. Kea found that Johnson could lift 5 to 10 pounds; stand or walk for less than an hour; sit for up to 30 minutes; occasionally climb and balance; and never stoop, crouch, kneel, or crawl. (Tr. 1283).  Plaintiff's fine motor skills were unimpaired. (Tr. 1284).  Dr. Kea rated Plaintiff's pain as severe.  (*Id.*).

### C.  Mental Impairments

Johnson met with Felicia Hameed, LSW, on November 24, 2009, and reported that she had suffered from depression for most of her life. (Tr. 913).  Plaintiff stated that she experienced poor sleep, appetite, and concentration. (Tr. 914).  She was tearful on a daily basis, lacked energy

and motivation, and experienced anhedonia. Johnson denied change in activities of daily living. She reported flashbacks and nightmares involving the death of her mother and the suicide of her son, and discussed abuse and problems in her marriage. (*Id.*). A mental status examination produced no significant findings. (Tr. 916). Plaintiff demonstrated sustained attention span and concentration, a euthymic mood, normal affect, logical and organized thought process, good insight and judgment, and cooperative behavior. She denied suicidal thoughts. (*Id.*). Ms. Hameed diagnosed recurrent major depression disorder, and assigned a Global Assessment of Functioning ("GAF") score in the range of 51 to 60, denoting moderate symptoms. (Tr. 917). Ms. Hameed recommended that Plaintiff return in two weeks for additional treatment. (*Id.*). It does not appear that Johnson attended this appointment.

Approximately one year later, in December 2010, Plaintiff saw Tina Oney, PCNS, for a mental health assessment. (Tr. 1258). Ms. Oney noted that Plaintiff had an extensive "no show" history at other clinics. Johnson reported that chronic jaw pain had increased her feelings of depression and isolation. Plaintiff stated that she slept only four to five hours each night, but admitted that her medication made her sleepy. (*Id.*). Ms. Oney found that Plaintiff appeared well groomed, but her mood was dysphoric and behavior guarded. (Tr. 1260). Johnson sustained concentration, displayed good memory, and had a logical, organized thought process. Though her speech was slow, it was unpressured and goal-directed. (*Id.*). Ms. Oney diagnosed dysthymia and chronic pain syndrome, and she assigned Plaintiff a GAF score of 51 to 60, representing moderate symptoms. (Tr. 1261). Ms. Oney also increased Johnson's Celexa prescription. (*Id.*).

State agency physician Dr. Margaret Zerba conducted a psychological consultative evaluation on March 24, 2010. (Tr. 965). Dr. Zerba described Plaintiff's appearance and

behavior as good and cooperative; her flow of conversation and thoughts as spontaneous, organized, and coherent; her affect as flat; her mood as depressed; her insight and judgment as fair. (Tr. 967-68). Dr. Zerba diagnosed adjustment disorder with depression and panic disorder without agoraphobia, and assigned a GAF score of 51. (Tr. 968). Based on this examination, Dr. Zerba concluded that Plaintiff was not impaired in her ability to understand and follow directions, or to pay attention to perform simple, repetitive tasks. Johnson's ability to relate to others and withstand stress of work was moderately impaired due to depression and panic attacks. (*Id.*).

In April 2010, state agency consultant Dr. David Demuth reviewed Plaintiff's case records, spanning from December 2009 to April 2010. (Tr. 970). He determined that Plaintiff was impaired by adjustment disorder with depression and panic disorder without agoraphobia. (Tr. 973, 975). Dr. Demuth concluded that Johnson was capable of performing simple repetitive tasks and some more complex tasks, without strict time or production demands. (Tr. 986). She should be limited to superficial contact with the public, coworkers, and supervisors. (*Id.*).

State agency physician Dr. Paul Tangeman completed a second review of Plaintiff's records on July 30, 2010. (Tr. 1024). Dr. Tangeman noted that Johnson's psychological condition had not changed significantly, and affirmed Dr. Demuth's assessment. (*Id.*).

On January 6, 2011, Johnson followed up with Ms. Oney. (Tr. 1240). She reported depressed mood, anhedonia, change in sleep, psychomotor retardation, loss of energy, poor concentration, and thoughts of death. (Tr. 1241). However, Ms. Oney observed that Plaintiff was talking more easily, had improved eye contact, and laughed appropriately several times. (Tr. 1246). Ms. Oney noted that Plaintiff's strength was treatment compliance, and her weaknesses were minimal social support, chronic poor adjustment (suicide of a child), and chronic health

problems (pain). (Tr. 1241).   A mental status examination showed that Plaintiff was sad, however, in all other areas she functioned appropriately. (Tr. 1246-47).  Ms. Oney increased Plaintiff's Celexa prescription. (Tr. 1247).

On January 25, 2011, Johnson reported back to Ms. Oney, complaining of low energy, poor concentration, feelings of worthlessness, and self-isolation. (Tr. 1225).  She stated that she could no longer drive because she would fall asleep, and her quality of life had severely declined due to neuralgia.  Johnson displayed a sad mood, poor eye contact, and quiet speech.  Johnson's concentration, hygiene, judgment, and thought process were appropriate. (*Id.*). Ms. Oney increased Plaintiff's Celexa. (Tr. 1226).

Johnson presented to Ms. Oney on March 17, 2011. (Tr. 1189).  She reported feeling tired and overmedicated, saying that it was hard to speak and she was sleeping constantly. (Tr. 1190).  Plaintiff's objective mental examination showed that she was sad, but functional in all other areas.  Ms. Oney discontinued Celexa, noting no benefit, and Xanax because Plaintiff no longer felt anxious. (*Id.*).

On March 18, 2011, Johnson began counseling with Dr. Abraham Wolf. (Tr. 1183). At first, Plaintiff appeared despondent and lethargic, but she became more animated as the session progressed. (Tr. 1185).  Johnson reported depressed mood, anhedonia, psychomotor retardation, loss of energy, poor concentration, thoughts of death, and panic attacks. (Tr. 1177, 1186).  Dr. Wolf diagnosed moderate major depressive disorder and assigned Plaintiff a GAF score in the range of 41 to 50, denoting serious symptoms. (Tr. 1186).

On April 1, 2011, Johnson began receiving regular psychiatric treatment with Dr. Michael Epstein. (Tr. 1165).  Plaintiff explained that she was getting poor sleep due to pain, which depleted her energy and inhibited her ability to concentrate. (Tr. 1167).  She reported

11

feeling hopeless because pain management and her psychiatric care providers informed her there was little they could do to alleviate her symptoms. Dr. Epstein found that Plaintiff was tired, withdrawn, depressed, frustrated, and overwhelmed. Otherwise, Johnson was well groomed; cooperative, calm, and in no acute distress; logical; able to sustain attention and concentration; and in possession of good judgment and insight. (*Id.*). Dr. Epstein diagnosed major depression, moderate, recurrent. (Tr. 1168).

From April through September 2011, Plaintiff regularly met with Dr. Epstein. The psychologist consistently described her speech as spontaneous with normal rate and flow; her appearance as well groomed, well nourished, and with good hygiene; her behavior as cooperative; her thought process as logical and organized; her attention and concentration as sustained; her recent and remote memory as within normal limits; and her judgment and insight as good. (Tr. 1160, 1143, 1129, 1117, 1111, 1105, 1089-90, 1303, 1319, 1372). Dr. Epstein also noted that Johnson's mood was depressed, overwhelmed, and frustrated. (*Id*.). At some appointments, Dr. Epstein observed that Plaintiff was sleepy, tired, and withdrawn (Tr. 1160, 1143, 1129, 1117, 1111, 1319, 1372), and he often described Plaintiff as being in no acute distress. (Tr. 1160, 1129, 1117, 1105, 1089).

Dr. Epstein filled out a mental medical source statement on July 5, 2011. (Tr. 1084). He thought Plaintiff's abilities to use judgment, function independently without special supervision, and maintain her appearance were "good." (Tr. 1083-84). Plaintiff's abilities to relate predictably in social situations and managing funds/schedules were "fair." (Tr. 1084). Dr. Epstein rated Johnson's ability to function as "significantly limited" in all other areas, including: following rules, maintaining attention and concentration, maintaining attendance, dealing with the public, relating to co-workers, interacting with supervisors, working with others, dealing with

work stress, understanding, remembering, and carrying out simple job instructions, socializing, behaving in an emotionally stable manner, and leaving her home. (Tr. 1083-84).  Dr. Epstein supported his assessment by noting that Plaintiff suffered from depression and chronic pain, which affected her concentration, sleep, energy level, and interest in formerly enjoyable activities. (Tr. 1084).  He concluded that, "given the chronic, poor treatable nature of her pain, her depression has proven difficult to treat as well." (*Id.*).

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. Ms. Johnson meets the insured status requirements of the Social Security Act through September 30, 2012.

2. Ms. Johnson has not engaged in substantial gainful activity since December 1, 2009, the alleged onset date.

3. Ms. Johnson has the following severe impairments: otalgia, Eustachian tube dysfunction, tympanosclerosis, chronic pain syndrome, panic disorder, and major depressive disorder.

4. Ms. Johnson does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that Ms. Johnson has the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c), with restrictions.  Specifically, Ms. Johnson is able to lift, carry, push, and pull up to 50 pounds occasionally and 25 pounds frequently.  In an eight-hour workday, she can sit, stand, and walk, each, for six hours, with normal breaks.  She is able to perform simple, routine tasks and some more complex tasks.  She cannot perform work involving strict time or production demands.  She is limited to superficial contact with the public, co-workers or supervisors.

6. Ms. Johnson is unable to perform any past relevant work.

7. Ms. Johnson was born on May 13, 1956 and was 53 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.  Ms. Johnson subsequently changed age category to advanced age.

8. Ms. Johnson has at least a high school education and is able to communicate in English.

. . .

10. Considering Ms. Johnson's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Ms. Johnson can perform.

11. Ms. Johnson has not been under a disability, as defined in the Social Security Act, from December 1, 2009, through the date of this decision.

(Tr. 566-75) (internal citations omitted).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20 C.F.R. §§ 404.1505, 416.905.

## V.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards.  *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*

14

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI. ANALYSIS

As a preliminary matter, Plaintiff's brief describes medical evidence that was not before the ALJ. (Plaintiff's Brief at 9-10). Although it appears that Johnson submitted this medical evidence to the Appeals Council, review was denied. (Tr. 1-4). When the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, those exhibits are not part of the record for purposes of judicial review. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). It follows that the Court cannot consider such evidence in deciding whether to uphold or reverse the ALJ's decision.

Additionally, the district court may remand the case for further administrative proceedings in light of additional evidence, "if a claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (*quoting Cline v. Comm'r of Social Security*, 96 F.3d 146, 148 (6th Cir. 1996)). Johnson makes no argument that a remand is warranted on the basis of the new evidence. Accordingly, the Court declines to determine whether the evidence necessitates further proceedings.

15

### A.  Plaintiff's Treating Physicians

Plaintiff's initial allegation of error provides that the ALJ violated the mandates of the treating source rule when evaluating Drs. Kea and Epstein's opinions.  The parties do not contest that these medical sources constitute "treating physicians."  The Court will address whether the ALJ adequately followed the mandates of the treating source rule with respect to each source in turn.

When assessing the medical evidence contained within a claimant's file, it is well-established that an ALJ must give special attention to the findings of the claimant's treating source.  See *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  The treating source doctrine recognizes that physicians who have a long-standing treating relationship with an individual are better equipped to provide a complete picture of the individual's health and treatment history. *Id.*; 20 C.F.R. § 404.1527(c)(2).  Under the Social Security Regulations, opinions from such physicians are entitled to controlling weight if the opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

The treating source's opinions are not entitled to such deference, however, if they are unsupported by the medical data in the record, or are inconsistent with the other substantial evidence in the record.  See *Miller v. Sec'y of Health & Human Servs.*, No. 91-1325, 1991 WL 229979, at *2 (6th Cir. Nov. 7, 1991) (Table).  When the treating physician's opinions are not entitled to controlling weight, the ALJ should apply specific factors to determine how much weight to give the opinion.  *Wilson*, 378 F.3d at 544, *see* 20 C.F.R. § 404.1527(c)(2)-(6).  The regulations also advise the ALJ to provide "good reasons" for the weight accorded to the treating source's opinion. 20 C.F.R. § 404.1527(c).  Regardless of how much weight is assigned to the

treating physician's opinions, the ALJ retains the power to make the ultimate decision of whether the claimant is disabled. *Walker v. Sec'y of Health & Human Servs.*, 980 F.2d 1066, 1070 (6th Cir. 1992) (citing *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984)).

### 1. Dr. Karen Kea

Dr. Kea served as one of many Metro Health physicians who treated Johnson's chronic pain involving the left ear, jaw, and neck. The first treatment notes from Dr. Kea contained in the record appear to be those dated June 15, 2008. (Tr. 924). During August 2011, Dr. Kea completed a medical source statement delineating her opinions as to Plaintiff's physical functional capacity. (Tr. 1283-84).

In his opinion, the ALJ highlighted the findings in Dr. Kea's medical source statement, particularly recounting the serious exertional and postural limitations Dr. Kea recommended. (Tr. 571). The ALJ then explained that he gave "less weight" to Dr. Kea's opinions and provided two reasons for doing so. First, the ALJ asserted that Dr. Kea's medical source statement provided no basis for the exertional and postural limitations assigned, aside from a statement that Johnson's medication for chronic pain caused drowsiness. Second, the ALJ observed that Dr. Kea's treatment notes, and those of other treating and examining physicians, did not provide support for Dr. Kea's recommended limitations. (*Id.*).

Upon review, the Court concludes that the ALJ provided "good reasons," in compliance with the treating source doctrine, for discounting the opinion of Dr. Kea. An examination of Dr. Kea's medical source statement shows that Dr. Kea failed to support the exertional and postural limitations she identified. (Tr. 1283). The text of the medical source form conspicuously requests that the physician describe the medical findings supporting each limitation and emphasizes that the usefulness of the physician's assessment depends on the extent to which this

was performed. (*Id.*).  The face of Dr. Kea's report is silent as to what findings support her conclusions regarding the postural and exertional limitations, though the form demanded such information.  The omissions inherently weakened the import of Dr. Kea's findings and corroborated the ALJ's ruling that the opinion was unsupported.  At the end of the medical source statement, when prompted to identify "additional reasons" that would interfere with Plaintiff's ability to work, Dr. Kea identified drowsiness caused by medication for chronic pain. The ALJ reasonably concluded that this statement was insufficient to substantiate the nature and extent of the physical limitations assigned.

Additionally, substantial evidence supports the ALJ's finding that treatment notes from Dr. Kea and other physicians do not bolster the extent of Dr. Kea's suggested physical limitations.  Plaintiff disagrees, asserting that she consistently sought medical treatment, was prescribed a variety of pain medication, and regularly had medication adjusted.  Johnson asserts that such evidence warrants greater deference to Dr. Kea's findings.  Despite Johnson's arguments, she does not explain how her course of treatment for jaw, ear, and throat pain supported the extent of the physical limitations Dr. Kea assigned.  Additionally, Plaintiff does not cite to Metro Health physicians recommending that she restrict her physical activities, nor is the Court aware of such recommendations in the record.  Treatment notes from Metro Health generally reflect that when asked what aggravated her pain, Plaintiff often replied that nothing did so or that there were no identifiable triggers. (*See, e.g.*, Tr. 906, 1122, 1201, 1212, 1029). Consequently, the ALJ's analysis in regard to Dr. Kea is supported by substantial evidence.

Plaintiff asserts that it was error for the ALJ to grant greater weight to the opinions of the state agency reviewing physicians over those issued by treating physician Dr. Kea.  Given that the ALJ gave good reasons for discounting Dr. Kea, it was reasonable to grant greater weight to

the state agency consultants Drs. McCloud and Hinzman.  Though Plaintiff argues that Drs. McCloud and Hinzman issued their opinions without the completed medical record before them, the ALJ accounted for the evidence that arose after their reviews when formulating the RFC. (Tr. 570-71).  Plaintiff does not point to evidence showing a significant change in her physical condition following the last state agency opinion that would undermine their opinions.  Accordingly, Plaintiff's argument is not well-taken.

### 2.  Dr. Michael Epstein

Dr. Epstein provided psychiatric treatment for Plaintiff beginning around April 2011. (Tr. 1165).  On July 5, 2011, Dr. Epstein completed a medical source statement. (Tr. 1083-84).  Dr. Epstein opined that Johnson's ability to function was significantly limited as to a number of occupational skills.  The psychiatrist explained that Johnson suffered from significant depression, relating to severe chronic pain, which affected various aspects of her life. (*Id.*).

The ALJ recounted Dr. Epstein's treatment history with Plaintiff and the psychiatrist's medical source statement, which stated Plaintiff was significantly limited in her ability to function in a range of work-related areas, including understanding, remembering, and carrying out simple job instructions. (Tr. 571-72).  The ALJ explained that he did not give full weight to Dr. Epstein's opinions because they appeared to be based on Johnson's subjective complaints, rather than the psychiatrist's clinical findings. (Tr. 572).  Citing to Dr. Epstein's treatment notes, the ALJ indicated that the psychiatrist consistently found Plaintiff to be functioning well in a variety of aspects, such as grooming, memory, logic, and judgment. (*Id.*).

Plaintiff argues that the ALJ erred by failing to identify what amount of weight he attributed to Dr. Epstein's opinion.  While the ALJ did not strictly follow the mandates of the treating source rule in this regard, the error does not require remand.  When an ALJ fails to state

and justify the weight he accorded to a treating source opinion, a reviewing court must remand the claim unless the ALJ's failure can be characterized as a harmless *de minimis* procedural violation. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004).  Failure to strictly follow the treating source doctrine is harmless when the Commissioner has "met the goal of . . . the procedural safeguard of reasons." *Id.*  Remand is necessitated when the court cannot engage in meaningful review of the ALJ's decision. *Id.* at 544.  Here, despite the ALJ neglecting to state the specific weight assigned to Dr. Epstein's opinion, the ALJ provided sufficient insight into his view of the doctor's opinion. The ALJ's opinion is structured such that the Court can engage in meaningful review.

In granting less than full weight, the ALJ questioned the supportability and consistency of Dr. Epstein's opinion, noting that the clinical results the psychiatrist's mental status examinations did not support the extent of the limitations assigned. (Tr. 572).  The ALJ pointed out that during mental status examinations, the psychologist consistently described Johnson as calm, cooperative, exhibiting normal memory, displaying logical thought processes, and having good insight and judgment. (*Id.*).  Such unremarkable findings are reflected in the record, and they contradict the psychologist's opinion that Johnson's ability to perform nearly all work-related tasks was "significantly limited."

Johnson contends that the ALJ ignored Dr. Epstein's additional objective findings that revealed Plaintiff was frustrated, depressed, and overwhelmed.  Yet, the ALJ expressly discussed these findings. (Tr. 571).  The ALJ also recounted Johnson's self-reports of anhedonia, poor sleep, difficulty concentrating, low motivation and energy, panic attacks, and suicidal thoughts. (*Id.*).  While this evidence supports the notion that Plaintiff was, to some degree, limited by her

mental impairments, the ALJ sufficiently supported his decision to devalue Dr. Epstein's more severe limitations by pointing to evidence in the record undermining them.

Johnson quotes *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) for the notion that

> [A] psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as a medical impairment . . . [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.

*Id.* (*quoting Poulin v. Bowen*, 817 F.2d 865, 873-74 (D.C. Cir. 1987) (*quoting Lebus v. Harris*, 526 F. Supp. 56, 60 (N.D. Cal. 1981)).  This principal does not change the outcome in this case. The ALJ pointed to medical evidence, including findings from Dr. Epstein's own treatment notes, contradicting the psychiatrist's opinion.  As a result, there exist valid reasons to question Dr. Epstein's conclusions.

Additionally, Plaintiff argues that it was error for the ALJ to grant greater weight to the opinions of one-time consultative psychologist Dr. Zerba and reviewing physicians Drs. DeMuth and Tangerman on the ground that their reports were authored approximately one and a half years prior to the administrative hearing.  However, the ALJ accounted for the additional evidence of record and reasonably concluded that these physicians' opinions were consistent with the record as a whole. (Tr. 572).

Johnson further contends that even if the ALJ reasonably determined that Drs. Epstein and Kea's opinions were not entitled to controlling weight, the ALJ erred by failing to address the factors denoted in 20 C.F.R. § 404.1527(c) in explaining the weight he attributed to the opinions.  But, Johnson has not identified, and the Court is unaware of, any binding case law

demanding an ALJ to specify how he analyzed each of these factors individually.  The regulations only require the ALJ to provide "'good reasons . . .  for the weight . . .  given to the treating source's opinion' –not an exhaustive factor-by-factor analysis." *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (alterations in original).  The "good reasons" requirement only demands the ALJ *consider* the factors provided in the regulations.  *Blanchard v. Comm'r of Soc. Sec.*, No. 11-CV-12595, 2012 WL 1453970, at *16-17 (E.D. Mich. Mar. 16, 2012), *R&R adopted* 2012 WL 1432589.  While including a thorough assessment of each factor might be helpful in assisting a claimant to better understand the ALJ's decision, so long as the ALJ's opinion clearly conveys why the doctor's opinion was credited or rejected, the ALJ has satisfied his burden. *Francis*, 414 F. App'x at 804.  Here, the ALJ sufficiently communicated the reasoning belying the decision to discount the treating sources at issue. Accordingly, remand is inappropriate.

### B.  Plaintiff's Credibility

Johnson further alleges that the ALJ improperly assessed her credibility.  It is the ALJ's responsibility to make decisions regarding the credibility of witnesses, and the ALJ's credibility determinations are entitled to considerable deference. *See Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (*citing Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).  "An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly [because the] ALJ is charged with the duty of observing a witness's demeanor and credibility." *Id*.  Notwithstanding, the ALJ's credibility finding must be supported by substantial evidence, *Walters*, 127 F.3d at 531, as the ALJ is "not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.' " *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007)

(*quoting* SSR 96-7p).  The undersigned concludes, however, that in the present case, substantial evidence supports the ALJ's adverse credibility finding.

In evaluating whether a claimant is disabled by pain, this circuit has established a two-part test. *Rogers*, 486 F.3d at 243.  The ALJ must consider (1) whether the objective medical evidence supports a finding of an underlying medical condition, and (2) whether the objectively established medical condition is of a level of severity that it can reasonably be expected to produce the claimant's alleged symptoms. *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986); *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994).  When evaluating credibility, the ALJ should consider a number of factors. *Walters*, 127 F.3d at 531; 20 C.F.R. § 404.1529(c)(2).  These other factors may include: statements from the claimant and physicians; diagnoses; daily activities; the location, duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; treatment, other than medication; and any other factors concerning functional limitations due to symptoms. *See Felisky*, 35 F.3d at 1039-40; 20 C.F.R. § 404.1529(a), (c)(3); SSR 96-7p, 1996 WL 374186, at *3.

Here, the ALJ found Plaintiff's statements were not credible as to the severity of her symptoms. (Tr. 570, 573).  That is, the ALJ concluded the symptoms Johnson described in her testimony, including pain, depression, and medication side effects, were not so severe that they rendered her disabled.  To support the credibility determination, the ALJ provided various rationales, some of which do not serve to undermine Johnson's credibility.  However, despite these flaws, the ALJ otherwise provided adequate reason to discount Johnson's allegations of disabling symptoms.

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters, 127 F.3d at 531 (citing Bradley v. Sec. of Health and Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988)).  In Johnson's case, the ALJ pointed to a number of inconsistencies between her testimony and other evidence in support of the adverse credibility finding.  While doing so, the ALJ considered the credibility factors delineated in the regulations.

For example, the ALJ explained that physicians' reports contradicted Johnson's assertions of disabling pain and demonstrated that she exaggerated the severity of her symptoms. (Tr. 573).  As the medical record reflects, healthcare professionals consistently, and over an extended period of time, described Johnson as being in no acute distress, despite her allegedly persistent and severe pain. (*See e.g.*, Tr. 1002, 1007, 1032-34, 1094-95, 1206).  These observations reasonably draw into question the accuracy of Johnson's reports regarding the severity of her pain, and served as an appropriate ground for the ALJ to discount her credibility.

Additionally, the ALJ assessed that Plaintiff's testimony describing the severity of her pain and the effectiveness of medication contradicted many of her earlier reports to physicians regarding the same. (Tr. 573).  Johnson testified that on an average day, even with medication, her pain ranged from a level "8" to "9" out of "10." (Tr. 573, 593-94).  However, treatment records reflect that although Johnson's reports of pain fluctuated, she most often reported her pain as much lower levels, ranging between a "2" and a "6," often as a result of medication providing relief. (*See, e.g.*, Tr. 1270, 1252, 1160, 1205). Johnson's reports of less severe pain were inconsistent with her testimony and demonstrate that treatment more effectively controlled her pain than she purported.

Similarly, observations from examining healthcare providers contradicted Plaintiff's allegation that medication rendered her so drowsy that she was unable to work. (Tr. 547, 589). As the ALJ noted, physicians consistently described Johnson as alert during office visits. (*See, e.g.*, Tr. 1026, 1253, 1265, 1272). Plaintiff argues that Drs. Kea and Epstein identified drowsiness as a medication side effect, but physicians' observations of Plaintiff undermined the level of drowsiness she alleges. For example, Dr. Epstein consistently opined that Johnson sustained attention and concentration during examinations. (Tr. 1143, 1160, 1167, 1111, 1117, 1129).

Other evidence addressed by the ALJ also calls into question Plaintiff's credibility. In evaluating credibility, the ALJ has the discretion to weigh all of the evidence and resolve significant conflicts. *See Walters*, 127 F.3d at 531 (*citing Bradley*, 862 F.2d at 1227). The ALJ accounted for additional findings from medical professionals which conflict with the severe symptoms Plaintiff alleged. In particular, the ALJ recounted that during treatment, Johnson was regularly calm and in no acute distress. (Tr. 570-71). Dr. Epstein's notes show that despite reports of depression, poor sleep, and panic attacks, Johnson consistently demonstrated normal behaviors and abilities. (Tr. 571-72). Johnson was calm, well groomed, and had good memory, logic, insight, and judgment. (Tr. 572). Such evidence does not comport with Plaintiff's allegations. Even though Johnson argues that her multiple prescriptions of, and adjustments to, pain medication support her credibility, she did not display limitations or symptoms showing that she was unable to work. These findings necessarily impact on Johnson's credibility and bolster the ALJ's conclusion. Overall, the ALJ's credibility assessment is supported by an adequate basis, making it appropriate for the Court to defer to the credibility finding.

According to Plaintiff, the ALJ's omission of relevant evidence renders his credibility analysis flawed. Johnson's argument lacks merit.  It is well-established that an ALJ is not required to discuss every piece of evidence in the record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (*quoting Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)).  "An ALJ can consider all of the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Id.*    Here, the ALJ's opinion reflects that he adequately considered the record.  Among other evidence, the ALJ recounted Plaintiff's testimony, her course of treatment, medication prescriptions and adjustments, her statements regarding the effectiveness of treatment, and comments and observations from her physicians.  Plaintiff has failed to present evidence sufficient to show a meaningful oversight or error by the ALJ.  The ALJ acknowledged evidence of pain and other symptoms; however, weighing the evidence as a whole, and expressly discussing significant conflicts, the ALJ reasonably found that Johnson's complaints as to the severity of these symptoms were not fully reliable.

## VII.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the final decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  July 15, 2014.

26